

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ MAY 0 6 2009 ★

**BROOKLYN OFFICE**

|  |  |
|---|---|
| MICHAEL MORRONE, Derivatively on Behalf of AROTECH CORPORATION, | Civil Action No. |
| Plaintiff, |  |
| v. |  |
| ROBERT S. EHRLICH, STEVEN ESSES, JAY M. EASTMAN, JACK E. ROSENFELD, LAWRENCE M. MILLER, EDWARD J. BOREY, SEYMOUR JONES, ELLIOT SLOYER, MICHAEL E. MARRUS, AVIHAI SHEN, |  |
| Defendants, |  |
| and |  |
| AROTECH CORPORATION, |  |
| Nominal Defendant. |  |

CV09 1910

TRAGER, J.

JURY TRIAL DEMANDED

J. ORENSTEIN, M.J.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Michael Morrone, by his attorneys, for his complaint against defendants, alleges upon personal knowledge with respect to paragraph 4, and upon information and belief based, *inter alia*, upon the investigation of counsel, as to all other allegations herein, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Arotech Corporation ("Arotech" or the "Company"), seeking to recover damages caused to the Company by its directors and/or a non-director senior executive officer who breached their fiduciary obligations to the Company arising out of violations of federal securities

laws they caused the Company to commit.  Named as a nominal defendant is the Company, and as defendants, certain of the Company's current and former directors and a former non-director senior executive officer.

2.     As alleged herein, the Individual Defendants (as defined below) knowingly or intentionally, or with reckless disregard for the truth, caused the Company to make false representations concerning Arotech's business, management capabilities, systems and controls, and strength and profitability from November 9, 2004 through November 14, 2005 (the "Relevant Period").  Throughout the Relevant Period, the Company was suffering from numerous undisclosed adverse factors that were negatively affecting its business that would foreseeably cause it to report declining financial results that were materially less than the market expectations that defendants had caused and cultivated.

3.     The Company's senior management had touted Arotech's growth prospects that supposedly would be realized from the "synergies" resulting from the subsidiaries it previously owned and those it acquired in 2004.  As it turned out, the Individual Defendants were unable to realize the growth they promised because one of the acquired subsidiaries had severe financial troubles, and ended up harming the Company and its shareholders by making repeated material misstatements and omissions to investors respecting the Company's financial performance.  Despite the challenged misconduct by the Individual Defendants and substantial harm that Arotech has already suffered, and is likely to suffer, the Director Defendants (as defined below) have both failed to investigate the challenged misconduct or seek remedial relief against any of the defendants, particularly those responsible for violations of federal securities laws.

## THE PARTIES

4.     Plaintiff, Michael Marrone, is an Arotech shareholder and has held shares of Arotech at all times relevant to this action.  Plaintiff will adequately and fairly represent the interests of Arotech and its shareholders in enforcing and prosecuting its rights.  Plaintiff has retained competent counsel, experienced in derivative litigation of this nature, to prosecute this action.  Plaintiff is a citizen of Pennsylvania.

5.     Nominal Defendant Arotech is a Delaware corporation engaged in the development, manufacture, and marketing of defense and security products and services worldwide.  Arotech's shares are traded on the NASDAQ National Market Exchange ("NASDAQ"), ticker symbol ARTX.  Currently, the Company is located at 1229 Oak Valley Drive, Ann Arbor, Michigan 48108.  The Company's chief executive offices and its principal place of business was located at 250 West 57th Street, Suite 310, New York, New York 10107 from the inception of the Relevant Period through March of 2005, at which time the principal executive offices were relocated to 354 Industry Drive, Auburn, Alabama 36830, where they remained throughout the remainder of the Relevant Period.  Also in March of 2005, and thereafter throughout the Relevant Period, Arotech retained the use of Sampen Corporation's ("Sampen") offices, located at 1133 East 22nd Street in Brooklyn, New York 11210, as an ancillary New York office for the Company.  Sampen is a New York corporation owned by members of Individual Defendant defendant Steven Esses's immediate family.

### Arotech's Directors

6.     Defendant Robert S. Ehrlich ("Ehrlich") has been Chairman of the Arotech Board of Directors (the "Board") since January 1993 and Chief Executive

3

Officer ("CEO") of Arotech since October 2002. From May 1991 until January 1993, Ehrlich was the Company's Vice Chairman of the Board, from May 1991 until October 2002 he was the Company's Chief Financial Officer ("CFO"), and from October 2002 until December 2005, Ehrlich also held the title of President. Furthermore, Ehrlich is Chairman of the Board's Executive and Finance Committee. Upon information and belief, Ehrlich is a citizen of Israel.

7. Defendant Steven Esses ("Esses") has been an Arotech director since July 2002. Esses has been the Company's Executive Vice President since January 2003, the Company's Chief Operating Officer since February 2003, and the Company's President since December 2005. Furthermore, Esses is a member of the Board's Executive and Finance Committee. Upon information and belief, Esses is a citizen of New York.

8. Defendant Jay M. Eastman ("Eastman") has been an Arotech director since October 1993. Furthermore, Eastman is Chairman of the Board's Compensation Committee and is a member of the Nominating Committee. Upon information and belief, Eastman is a citizen of New York.

9. Defendant Edward J. Borey ("Borey") has been an Arotech director since December 2003. Borey is a member of the Board's Audit Committee, and was formerly a member of the Nominating Committee, Compensation Committee, and the Executive and Finance Committee. Upon information and belief, Borey is a citizen of Washington.

10. Defendant Seymour Jones ("Jones") has been an Arotech director since July 2005. Jones is Chairman of the Board's Audit Committee and is a member of the Nominating Committee. Upon information and belief, Jones is a citizen of New York.

11.     Defendant Elliot Sloyer ("Sloyer") has been an Arotech director since October 2007.  Sloyer is a member of the Board's Audit Committee, Compensation Committee, and the Executive and Finance Committee.  Upon information and belief, Sloyer is a citizen of Connecticut.

12.     Defendant Michael E. Marrus ("Marrus") has been an Arotech director since October 2007.  Marrus is Chairman of the Board's Nominating Committee and is a member of the Compensation Committee and the Executive and Finance Committee.  Upon information and belief, Marrus is a citizen of New York.

**Arotech's Former Directors**

13.     Defendant Jack E. Rosenfeld ("Rosenfeld") was an Arotech director from October 1993 through October 2008, at which time he retired as a director.  Rosenfeld was a member of the Board's Audit Committee.  Upon information and belief, Rosenfeld is a citizen of New York.

14.     Defendant Lawrence M. Miller ("Miller") was an Arotech director from November 1996 through October 2008, at which time he retired as a director.  Miller was a member of the Board's Audit Committee.  Upon information and belief, Miller is a citizen of the District of Columbia.

15.     Bert W. Wasserman ("Wasserman") was an Arotech director from February 2003 until his death on or about August 1, 2005.  He was a member of the Audit Committee and the Compensation Committee.  He was replaced on the Board by Individual Defendant Jones.

**Former Arotech Officer**

5

16.     Defendant Avihai Shen ("Shen") was the Company's Chief Financial Officer and Vice President of Financial Affairs during the Relevant Period until his removal on or about March 31, 2006.  Upon information and belief, Shen is a resident of Texas.

17.     The defendants named in paragraphs 6 through 14 and 16 will be referred to herein as the "Individual Defendants."  The defendants named in paragraphs 6 through 14 will be referred to herein as the "Director Defendants."  The defendant named in paragraph 16 will be referred to herein as the "Officer Defendant."

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states.  This action is not brought collusively to confer jurisdiction on this Court.

19.     Venue is proper under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the plaintiff's claims occurred in this District, and Arotech has suffered and will continue to suffer harm in this District.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

20.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due car and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were, and are, required to act in

furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owed and owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

## SUBSTANTIVE ALLEGATIONS

### Armour of America's True Operating Condition

21.     In August 2004, Arotech acquired Armour of America ("AoA") for the sum of approximately $22 million. The price exceeded Arotech's total revenues from continuing operations for the previous year.

22.     The Individual Defendants caused or allowed Arotech to acquire AoA seemingly without completing full due diligence because also in August 2004, the U.S. government, a key customer of both AoA and Arotech, terminated a contract it had with AoA to armor approximately 20 CH-47 helicopters. The government designated this action a "termination for default" ("T4D") because it concluded AoA had not told the truth about its product's specifications and performance. Contractors must be found "responsible" in order to be eligible for federal contracts, and T4Ds are a strong negative indicator of a contractor's responsibility. 48 C.F.R. §§ 9.104-1(c), 9.104-3(b), 42.1501 (Federal Acquisition Regulation). Therefore, the T4D in August 2004 significantly reduced AoA's ability to win future contracts. It is estimated that AoA lost millions of dollars solely in future helicopter armoring contracts as a result of the T4D.

23.    Defendant Esses and other members of the senior management of Arotech were aware of the T4D and met with the Chief Operating Officer and General Manager of AoA, John Nehmens ("Nehmens") regarding how to adjust operations due to the T4D and the difficulty it created in obtaining future contracts because of the need to explain the default.

24.    As predicted, AoA's sales declined because the U.S. government was a major customer of AoA, even though it continued to project large future revenues. The dearth of new contracts resulted in an excess inventory of materials such as Kevlar, which must be kept on hand in order to quickly fill orders, and must be used within approximately six months of purchase.

25.    AoA quickly discovered that the T4D also made it more difficult to work with other defense contractors, because AoA's contracts had lower priority than its competitors. For example, Honeywell International, Inc. ("Honeywell") manufactures a lighter alternative to Kevlar named Spectra. Due to the low priority of AoA's contracts, Honeywell was not willing to sell sufficient quantities of Spectra to AoA, and without having Spectra on-hand, AoA was unable to compete for many future military contracts.

26.    Internal control problems were present throughout AoA. Poor internal inventory controls led to AoA manufacturing uncoordinated numbers of different parts of its products. For example, at one point AoA had to write down the incomplete stock of its "Leguard" tactical leg armor because it was unable to complete final Leguard products even though it had an excess of certain components. Meanwhile, other obsolete and unsalable items in AoA's inventory were not written down until after Arotech completed

a Convertible Debt Financing transaction in September 2005, a full year after the Company acquired AoA. *See* ¶ 41, below.

27.     Upon information and belief, Arotech management, including Individual Defendants Ehrlich, Esses, and Shen, were aware of AoA's inventory control problems and received regular updates on material, works in progress, and finished goods. AoA was, in fact, using a format designed by Arotech for its monthly sales projection reports, which included information such as the probability of orders for AoA's products. Senior management at Arotech even had access to AoA's accounting software, therefore giving them the ability to run reports on AoA's inventory and sales.

## Defendants' False and Misleading Statements

28.     On November 9, 2004, the first day of the Relevant Period, Arotech issued a press release announcing its results for its third quarter and the nine months ending on September 30, 2004. Revenues for the quarter were $16.3 million, an increase of 185% over the corresponding period in 2003, and 64% over the second quarter of 2004. Revenue had grown to over $33 million for the first nine months of 2004, a 150% increase over the corresponding period for the prior year. The very positive tone of the press release included a statement by Director Defendant Ehrlich calling it "our best quarter ever." Ehrlich went on to say:

> This record achievement stems from a series of successful strategic steps we have taken over the past few years to transform Arotech into a major vendor of security and defense equipment.   We have added several excellent companies to our portfolio, and these companies are contributing to our growth and expanding our customer base.

30.     On March 31, 2005, Arotech issued a press release announcing "record" results for its fourth quarter and the year-ending on December 31, 2004. Revenues for

9

the quarter were $16.6, an increase of 304% over the year-ago period, and 2% over the third quarter of 2004. For the entire year, revenues increased to $50 million, which was 188% more than in 2003.

31.     Ehrlich again made positive statements about the Company's performance and prospective business opportunities in the Company's March 31, 2005, release, including in relevant part:

> 2004 was a very productive and successful year for us, in which we transformed the Company into a major vendor in the security and defense sector. We accomplished the goals that we set out for ourselves at the beginning of the year, becoming cash flow positive and growing both organically and through strategic acquisitions.
>
> We finished the year with new record-high revenues and EBITDA [Earnings Before Interest, Taxes, Depreciation and Amortization] profitability. The subsidiaries that we acquired in 2004 are now fully integrated into the Company and we have begun to benefit from the synergies of our entire portfolio of companies. Focused on three key product areas – simulation and security, armor, and battery and power systems – in which we have vast experience and expertise, we are well-positioned to continue to increase our market share in the rapidly growing defense and security sector.
>
> In 2005, in addition to growing the Company internally, we will continue to focus on growth opportunities through strategic acquisitions that will significantly contribute to our operating results. I am proud of our achievements in 2004 and look forward to another year of substantial growth in 2005.

32.     On the same day, Individual Defendants Ehrlich, Esses, Eastman, Miller, Rosenfeld, Borey, and Shen, and deceased director Wasserman, signed the Company's 2004 Form 10-K, which was filed with the SEC. The 2004 Form 10-K discussed the same financial results as in the press release, and asserted that the Company's consolidated financial statements "have been prepared in accordance with generally

accepted accounting principles in the United States ('. . . GAAP')." Regarding "Goodwill," it stated that:

> Goodwill represents the excess of cost over the fair value of the net assets of businesses acquired. Under Statement of Financial Accounting Standard No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142") goodwill acquired in a business combination on or after July 1, 2001, is not amortized after January 1, 2002.
>
> SFAS No. 142 requires goodwill to be tested for impairment on adoption of the Statement and at least annually thereafter or between annual tests in certain circumstances, and written down when impaired, rather than being amortized as previous accounting standards required. Goodwill is tested for impairment by comparing the fair value of the Company's reportable units with their carrying value. Fair value is determined using discounted cash flows. Significant estimates used in the methodologies include estimates of future cash flow, future short-term and long-term growth rates, weighted average cost of capital and estimates of market multiples for the reportable units.
>
> The Company performed the required annual impairment test of goodwill. Based on the management projections and using expected future discounted operating cash flows, no indication of goodwill impairment was identified.

33.     In reality, the statements contained in Arotech's November 9, 2004 and March 31, 2005 releases and the statements contained in the Company's 2004 Form 10-K, referenced above, were each materially false and misleading when made, and were known by the Individual Defendants to be false or were recklessly disregarded as such, for the following reasons, among others:

(a)     At all times during the Relevant Period, the Company's purported success was not the result of its integration of acquisitions or the Individual Defendants' competent management. In fact, throughout the Relevant Period, the acquisition of AoA

11

was not proceeding according to plan as AoA's sales were faltering badly, and, to mask this fact, the Individual Defendants had propped up the Company's results by manipulating Arotech's accounting by failing to report the impaired condition of its assets or to properly reserve for the necessary and proper impairment expenses;

(b)     At all times during the Relevant Period, the Individual Defendants had materially overstated the Company's profitability by under-reporting Arotech's diminished asset values and rising impairment costs by failing to make proper, timely adjustments to the Company's stated reports;

(c)     Throughout the Relevant Period, Arotech did not have adequate systems of internal operational or financial controls, and as a result Arotech's reported financial statements were not true, accurate or reliable;

(d)     As a result of the foregoing, throughout the Relevant Period the Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules; and

(e)     As a result of the aforementioned adverse conditions which the Individual Defendants failed to disclose, throughout the Relevant Period, the Individual Defendants lacked any reasonable basis to claim that Arotech was operating according to plan or that Arotech could achieve guidance sponsored and/or endorsed by the Individual Defendants.

34.     On May 11, 2005, Arotech announced financial results for the first quarter ended March 31, 2005.  The Company reported revenues of $10.4 million, a 45% increase over the year-ago period.  It reported a negative adjusted EBITDA of $356,217, compared to a negative adjusted EBITDA of $680,718 for the corresponding period in

2004. The net loss before a deemed dividend to certain shareholders was $2.5 million ($0.03 per share) for the quarter, compared to a net loss of $2.5 million ($0.04 per share) for the corresponding period for the previous year. The net loss was explained as being "primarily due to non-cash charges associated with acquisitions and financings."

35.     The May 11, 2005, press release included guidance for the full year of 2005. The Company reiterated its expectation of at least 25% revenue growth compared to 2004. Adjusted EBITDA from existing operations was projected to triple for the year. Revenues for the second quarter of 2005 were predicted to increase by at least 30% compared to the same quarter of 2004, and adjusted EBITDA was expected to be breakeven or above for the quarter.

36.     On May 16, 2005, the Company filed a Form 10-Q for the first quarter of 2005, which was signed and certified by Individual Defendants Ehrlich and Shen. The 10-Q repeated many of the statements in the May 11, 2005, release. The Company stated that its financial statements were in compliance with GAAP for interim financial information and that the financial statements reflected all adjustments necessary for a fair presentation of the Company's financial position as of March 31, 2005, and its operating results and cash flows for the three-month periods ended March 31, 2005, and 2004. The statements made by Individual Defendants Ehrlich and Shen in the Company's May 11, 2005, press release and in Arotech's May 16, 2005, Form 10-Q were each materially false and misleading when made and were known by Individual Defendants Ehrlich and Shen to be false at that time, or were recklessly disregarded as such by them, for the reasons stated in paragraph 33.

13

37.     On August 15, 2005, Arotech issued a press release announcing its second quarter results for the period ending June 20, 2005. Announced revenues for the quarter were $12.2 million, an increase of 23.3% over the year-ago period. On a GAAP basis, gross profit was $3.6 million, or 30% of revenues, compared to $3.4 million, or 34% of revenues, for the corresponding period in 2004. The Company stated that the decline in the percentage of gross profit compared to revenue was due to "a lower margin mix of products in some of Arotech's subsidiaries."

38.     The Company's operating loss for the second quarter of 2005 was $4.5 million, an increase of $2.5 million over the second quarter of 2004. According to the August 15, 2005, press release, "[o]perating expenses for the quarter included a write down of $2.4 million for impairment of goodwill and other intangible assets in relation to Arotech's Armour of America subsidiary."

39.     Despite these negative financial results, Director Defendant Ehrlich was quoted as stating, in relevant part:

> During the quarter, we continued to make progress towards achieving our goals for 2005. The quarter was highlighted by the strong demand for our simulation training solutions and vehicle-armoring products, which we anticipate will continue throughout the year. In fact a few days ago, we announced new orders for almost $3 million in our vehicle armoring units.

> This strong demand was somewhat offset by the performance of our Armour of America, AoA, subsidiary which was below our expectations. As a result, we wrote down approximately $2.4 million in impairment charges. While we are disappointed with AoA's progress, we believe that there are significant opportunities to be achieved under the right focus. We therefore recently hired a President of our Armor Division, who will focus special attention on improving AoA.

> We continue to maintain our outlook for substantial growth from existing operations for the full year of 2005 and remain confident that the second half of the year will be stronger in comparison to both the first half of 2005 and the corresponding period in 2004.
>
> The organic growth of the Company has become our key focus and we are working diligently towards achieving net profitability through our existing operations. With our current portfolio of high-quality leading edge products, our well-established customer base and the increasing opportunities in the rapidly growing sectors in which we operate, we are hopeful that we can achieve net GAAP profitability at the end of 2006.

40.     On that same day, the Company also filed a Form 10-Q with the SEC, which was signed and certified by Individual Defendants Ehrlich and Shen. The 10-Q repeated many of the statements in the August 15, 2005, release. The Company stated that its financial statements were in compliance with GAAP for interim financial information and that the financial statements reflected all adjustments necessary for a fair presentation of the Company's financial position as of June 30, 2005, and its operating results and cash flows for the three-month periods ended June 30, 2005, and 2004. The statements made by Individual Defendants Ehrlich and Shen in the Company's August 15, 2005, press release and in Arotech's August 15, 2005, Form 10-Q were each materially false and misleading when made and were known by Individual Defendants Ehrlich and Shen to be false at that time, or were recklessly disregarded as such by them, for the reasons stated in paragraph 33.

41.     On September 30, 2005, after Individual Defendants Ehrlich and Shen had deemphasized or concealed the actual impact of AoA's diminished value and had knowingly made materially false and misleading statements about Arotech's financial position and that Arotech was operating at or above target, or were recklessly disregarded

15

as such by them, the Company issued a release entitled, "Arotech Secures $17.5 Million Convertible Debt Financing and Revamps Operations to Focus on Organic Growth and GAAP Profitability." which announced that Arotech at least $17.5 million in Company "Convertible Debt Financing."  The press release stated that the Company had privately sold "$17.5 million principal amount of senior secured notes, convertible to common stock at [$14.00] per share," which was a 26% premium of the stock trading price at the time, to certain institutional investors.  It also noted that Arotech expected "the proceeds will permit it to continue to grow its business organically without a need to raise additional capital" and that the Company would focus on achieving sustainable profitable growth through its existing operations, while also vigorously cutting operating costs, including consolidating certain of its subsidiaries, shifting personnel, and reassigning responsibilities.  It also reduced senior employee salaries and directors' fees, and took other measures to cut costs.

42.    In addition, the September 30, 2005 press release quoted Director Defendant Ehrlich, who stated, "[t]he organic growth of the Company is now our key focus and we are determined to achieve GAAP profitability through our existing operation."  He expressed regret at returning to the capital market, but emphasized "the new financing, with a conversion price substantially above market, is an endorsement of our investors' confidence in our ability to meet these goals."  Although the press release maintained a generally positive tone regarding the Company's future financial prospects, Director Defendant Ehrlich noted that AoA's performance was disappointing and hurting Company earnings, however, he stated his belief that the Convertible Debt Financing would "work to turn around this subsidiary."

43.     The statements made by Individual Defendants Ehrlich and Shen in the Company's August 15, 2005, press release, and by Director Defendant Ehrlich in the September 30, 2005, release, were materially false and misleading when made and were known by Individual Defendants Ehrlich and Shen to be false at that time, or were recklessly disregarded as such by them, for the reasons stated in paragraph 33.

**The True Financial and Operational Condition of Arotech is Belatedly Disclosed**

44.     On November 14, 2005, less than two months after selling at least $17.5 million in convertible debt, the Company began to reveal its true financial condition. On that date, the Company published a release reporting that, on a GAAP basis, the Company's third quarter revenues (*i.e.,* for the period ending September 30, 2005) were $11.2 million compared to $16.3 million for the corresponding period in 2005, a decrease of over $5 million. The decline was "largely attributable" to AoA's underperformance. Gross profit for the quarter was $2.8 million or 24.6% or revenues (including a $650,000 inventory wtite-off), compared to $4.7 million or 29% of revenues for the same period in 2004. The Company's results included a charge to operating income of $8.7 million for the impairment of goodwill and other intangible assets reflecting a reevaluation of AoA's value resulting from its disappointing performance to date. After including this charge, the Company sustained an operating loss of $12 million compared to breakeven for the same period in 2004. The net loss was $12.7 million ($0.15 per share) compared to a net loss of $1 million ($0.01 per share) for the corresponding period in 2004.

45.     Furthermore, according to the November 14, 2005 release, not only did the Company disclose that the "AoA acquisition has not contributed as expected," but also that Lee Ferguson, the President of AoA, had resigned, surprisingly only weeks after his

17

appointment on August 15, 2005. Such disclosures were even more unexpected because the Company previously stated that the integration of AoA was substantially complete.

46.     Due to the large disparity between Individual Defendants' prior statements and those on November 14, on November 15, 2005, Arotech stock dropped over $2.24 per share on the NASDAQ, closing at $6.16 per share, a decline of almost 27% compared to the previous day's closing at $8.40 per share.         .

47.     As a result of the materially false and misleading statements and the failure to disclose information, including the underperformance of AoA, over a period of approximately twelve months, the Individual Defendants created an unrealistic positive assessment of Arotech and its business, prospects and operations, causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  However, when investors learned of the Individual Defendants' misrepresentations and fraudulent conduct, shares of Arotech immediately sharply declined.

48.     At no time during the Relevant Period did the Defendants identify the true cause for AofA's poor performance, *viz.,* the T4D and its affect on AofA's ability to obtain new business with the U.S. government.

**The Federal Securities Fraud Class Action**

49.     The above-described misconduct is the subject of a civil securities fraud class action filed in the United States District Court for the Eastern District of New York styled as *Akerman v. Arotech Corp.,* Master File No. 07-cv-1838 (RJD) (VVP) (the "Securities Fraud Action").  The class consists of persons who purchased Arotech common stock between November 9, 2004, and November 15, 2005.  Plaintiffs in the Securities Fraud Action charged the Company and Individual Defendants Ehrlich, Esses,

18

and Shen (collectively the "Securities Fraud Defendants") with violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

50.    As alleged in the Securities Fraud Action, the Securities Fraud Defendants had access to adverse information about AofA that was undisclosed; exercised control over Arotech's SEC filings, press releases, and other statements that contained material misrepresentations and omissions that misled plaintiffs and the class regarding Arotech's business, management capabilities, systems and controls, and strength and profitability; signed the Company's SEC filings attesting that the information in those documents fairly presented, in all material respects, the consolidated financial condition of the Company and its subsidiaries, including AofA; and the material misrepresentations and omissions were either knowingly false when made or the Securities Fraud Defendants recklessly disregarded material adverse facts at the time the statements were made.

51.    On March 30, 2009, the United States District Court for the Eastern District of New York denied the Securities Fraud Defendants' motion to dismiss the Securities Fraud Action pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds of materiality, scienter, and particularity. *See Akerman v. Arotech Corp.,* Master File No. 07-cv-1838 (RJD) (VVP), 2009 U.S. Dist. LEXIS 27285 (E.D.N.Y. Mar. 30, 2009). To state a claim, plaintiffs were required to establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendant's action caused injury to the plaintiffs." *Id.*, * 19 (quotation omitted). The court determined that the plaintiffs

met their heightened burden under Fed. R. Civ. P. 9(b) of pleading the circumstances of fraud with particularity. *Id.*, * 19-20. They also satisfied the stringent requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(3)(A) ("PSLRA") of pleading scienter "with particularity facts giving rise to a *strong* inference that the defendant acted with the *requisite state of mind.*" *Id.*, * 21 (emphasis in original).

52.     Specifically, the court focused on what it called plaintiffs' "T4D theory," which was that AOA's T4D was a "significantly adverse event" that would eventually "all but destroy" its ability to win future business; this effect, not immediate but inevitable, should have been disclosed promptly; however, Arotech, embarrassed that it had just "gambled a year's worth of the company's revenues" acquiring a firm with a major problem, tried to say as little about it as possible for as long as possible; and in the course of doing so, the "defendants released some accurate numbers, emphasized the most optimistic aspects of the acquisition, made some disclosures of negative information that were either untimely—or, if not untrue per se, not the whole of the story—all the while withholding news of the T4D, the one fact that would have cast the light of true accuracy on all the other disclosures." *Id.*, * 27-28.

53.     The court found that the failure to disclose the T4D was material, *id.*, * 30-31; fraud being the reason for non-disclosure of the T4D was as cogent as any other explanation, *id.*, * 31-35; the defendants knew or should have known when they released non-adverse, affirmatively optimistic information about AofA, that it had been "saddled" with a T4D that would negatively affect its ability to obtain new business, *id.*, * 38-41; and that plaintiffs had pleaded the T4D theory with sufficient particularity, *id.*, * 41-42.

As a result, having satisfied the requirements of Fed. R. Civ. P. 9(b) and the PSLRA, the Securities Fraud Defendants' motion to dismiss was denied.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

54.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

55.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

        (a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the

highest quality performance of their business; exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable laws, rules, regulations and requirements;

(b)    When placed on notice of improper or imprudent conduct by the Company and/or its officers and employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence; and

(c)    Maintain and implement an adequate system of controls and information systems, such that no officer, director or employee of the Company would make materially false or unreliable statements about Arotech and its financial performance or its compliance with other governing laws and regulations to the investing public.

57.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its operations, products, operational trends, financial statements and reporting controls, markets, historical performance and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

58.    Individual Defendants Ehrlich, Esses, and Shen, by virtue of their high-level positions with the Company and (except for Shen) on its Board, directly participated in the management of the Company, were directly involved in the day-to-day operations

of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that false and misleading statements were being issued regarding the Company, and approved or ratified these statements.

59.   Individual Defendants Ehrlich, Esses, Eastman, Miller, Rosenfeld, Borey, and Shen, and deceased director Wasserman, signed the Company's 2004 Form 10-K filed with the SEC on March 31, 2005. *See* ¶ 32, above.

60.   Individual Defendants Rosenfeld and Miller, and deceased director Wasserman, were on the Company's Audit Committee during the Relevant Period yet took no action to prevent or mitigate the Company's material misstatements and omissions. In fact, by signing the Company's 2004 Form 10-K, they were active participants in the misstatements and omissions.

## DEMAND WOULD BE FUTILE

61.   As a result of the facts set forth herein, plaintiff has not made a demand on the Board to bring this cause of action because such a demand would be futile. At the time this derivative action was commenced, the Board consisted of seven members: Ehrlich, Esses, Eastman, Borey, Jones, Sloyer, and Marrus. All but Marrus and Sloyer were directors during the Relevant Period. As detailed below, each of the directors are subject to substantial liability on these derivative claims and are therefore in no position to render a disinterested judgment on whether the Company should bring them, and/or

lack sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims against the Individual Defendants.

62.     All of these directors face a substantial likelihood of liability in this action because of their failure, as directors, to assure that a reliable system of financial controls was in place and functioning effectively.  The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire board faces substantial exposure to liability.  These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for the Company.

63.     The above allegations of this Complaint show in detail that that Individual Defendants Ehrlich, Esses and Shen engaged in activities that have created a substantial likelihood of liability for securities fraud.

64.     Director Defendant Ehrlich has been Chairman of the Arotech Board of Directors (the "Board") since January 1993, CEO of the Arotech since October 2002, and was President from October 2002 to December 2005.  As a current officer of the Company, Ehrlich is unable to make an independent or disinterested decision as to whether to initiate suit on behalf of the Company.

65.     Director Defendant Esses has been the Company's Executive Vice President since January 2003, the Company's Chief Operating Officer since February 2003, and the Company's President since December 2005.  As a current officer of the Company, Ehrlich is unable to make an independent or disinterested decision as to whether to initiate suit on behalf of the Company.

66.   Moreover, Director Defendants Ehrlich and Esses either had actual knowledge of the wrongdoing alleged in that case and/or were sufficiently senior and knowledgeable about the Company's business to have knowledge about such misconduct.

67.   Despite their knowledge of the blatant misrepresentations and omissions by Director Defendants Ehrlich and Esses, the ongoing allegations against the Securities Fraud Defendants, and the fact that Arotech's common stock currently trades for well under $1 per share (Arotech closed at $0.89 on April 30, 2009, http://moneycentral.msn.com/detail/stock_quote?Symbol=US:ARTX (last viewed Apr. 30, 2009)), Director Defendants Eastman, Marrus, and Sloyer, who are members of the Company's Compensation Committee, and Director Defendants Borey and Rosenfeld, and deceased director Wasserman, who were former members of the Company's Compensation Committee, recommended and continue to recommend substantial sums in compensation and other perquisites to Director Defendants Ehrlich and Esses. For example, Director Defendant Ehrlich earned well over $1 million in both 2007 and 2008.

68.   Furthermore, despite their knowledge of the blatant misrepresentations and omissions by Director Defendants Ehrlich and Esses and the ongoing allegations against the Securities Fraud Defendants, the Director Defendants failed to launch an outside or independent investigation of the claims against the Securities Fraud Defendants.

69.   Any suit brought about by the Company's current Board members to remedy the wrongs alleged herein would likely result in additional lawsuits being filed against one or more of the Director Defendants. As a result, the Director Defendants are

conflicted in making any supposedly independent determination whether to sue themselves.

70.     In fact, Arotech has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. The Director Defendants, however, have yet to file a single lawsuit against themselves or any others who were responsible for the wrongful conduct so as to recover those losses for the Company.

71.     If the Director Defendants were to bring this derivative action against themselves, they would expose their own recklessness and misconduct which underlies the allegations against the Company contained in the Securities Fraud Action.

## HARM TO THE COMPANY

72.     The systemic misconduct by the Individual Defendants has caused and continues to cause substantial harm to the Company. Their actions have resulted in a precipitous decline in the price of the Company's common stock, adverse publicity, a securities fraud class action lawsuit that has survived a motion to dismiss, fees to outside counsel, other litigation expenses, and other significant costs to the Company.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF THEIR FIDUCIARY DUTIES OF LOYALTY

73.     Plaintiff repeats and re-alleges each of the allegations in paragraphs 1 through 72 as if fully set forth herein. Based upon the allegations set forth in the preceding paragraphs, the Individual Defendants intentionally or recklessly breached their fiduciary duties of loyalty to the Company and aided and abetted one another in breaching their fiduciary duties to the Company.

26

74.     The Individual Defendants participated in or had actual or constructive knowledge of the Company's undisclosed adverse factors that were negatively impacting Arotech's business and that would foreseeably cause it to report declining financial results that were materially less than the market expectations that the Individual Defendants had caused and cultivated, and failed to correct the Company's public announcements.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

75.     The Individual Defendants abused the trust reposed in them by virtue of their positions and breached their fiduciary duty of loyalty by abdicating their duty of oversight.  As the result of their sustained and systematic failure to exercise oversight, the Individual Defendants caused or allowed the Company's business to be conducted in violation of the extensive legal requirements and regulations known to them.

76.     By reason of the foregoing, the Individual Defendants have proximately caused significant injury to the Company, which has been, and will continue to be, substantially damaged as the foreseeable result of their wrongful acts and omissions.

77.     Plaintiff, on behalf of Arotech, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Declaring that the directors and officers named as Individual Defendants herein have breached their fiduciary duties as alleged herein;

B.     Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

C.      Requiring the Individual Defendants to remit to the Company all of their salaries and other compensation received for the periods when they breached their duties;

D.      Ordering that the Individual Defendants and those under their supervision and control refrain from the commission of such further unlawful activities as are alleged herein and implement comprehensive corrective measures including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein which will rectify all such wrongs as have been committed and prevent their recurrence;

E.      Awarding plaintiff reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 6, 2009

RIGRODSKY & LONG, P.A.

By:

Seth D. Rigrodsky (SR-9430)
Timothy J. MacFall (TM-8639)
585 Stewart Avenue, Suite 304
Garden City, NY 11530
Tel: (516) 683-3516
Fax: (302) 654-7530

GLANCY BINKOW & GOLDBERG LLP
Lionel Z. Glancy
Michael Goldberg
Richard A. Maniskas
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160

*Counsel for Plaintiff*