**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL MORRONE, Derivatively on Behalf of AROTECH CORPORATION, | Case No. 09-cv-1910 (RJD) (VVP) |
| Plaintiff, | |
| v. | |
| ROBERT S. EHRLICH, STEVEN ESSES, JAY M. EASTMAN, JACK E. ROSENFELD, LAWRENCE M. MILLER, EDWARD J. BOREY, SEYMOUR JONES, ELLIOT SLOYER, MICHAEL E. MARRUS, AVIHAI SHEN, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| AROTECH CORPORATION, | |
| Nominal Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S**
**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## I.      INTRODUCTION

Plaintiff Michael Marrone ("Plaintiff"), a shareholder of Nominal Defendant Arotech Corporation ("Arotech" or the "Company") who brought this derivative action on behalf of the Company against its current directors and certain former directors and a former officer of the Company (collectively, the "Individual Defendants"), respectfully submits this memorandum of law in opposition to the Defendants' motion to dismiss his Verified Shareholder Derivative Complaint ("Complaint").

Defendants' move to dismiss the Complaint for failure to make a demand upon the Company's Board of Directors ("Board") as required by "Delaware" law[1] and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  The Defendants' analysis of Delaware law, however, simply ignores the many highly material facts in the Complaint and the public record that demonstrate that demand on the Board would have been futile. For example, it is undisputed that:  (1) the same misconduct underlying this derivative action was also the subject of a securities fraud complaint that this Court sustained following defendants' motion to dismiss that action (the "Akerman Action") for the purported failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b), or plead scienter with the requisite particularity required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(3) (see *Akerman v. Arotech Corp.,* 608 F. Supp. 2d 372, 381 (E.D.N.Y. 2009)[2]; (2) a majority of the members of the Board at the

_____

[1] The Defendants incorrectly cite Del. Ct. Ch. R. 23.1 as authority for the demand requirement.  Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Verified Shareholder Derivative Complaint ("Def. Mem."), 2.  While Delaware law controls as to the substance of the demand requirement and its exceptions (*Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90 (1991)), it is Fed. R. Civ. P. 23.1 that governs.

[2] The Akerman Action is now being settled by the Company for $2.9 million.

time the Complaint was filed, Individual Defendants Ehrlich, Esses, Eastman, and Borey,[3] signed a Form 10-K that this Court determined was materially false and misleading when issued, and that Defendants Ehrlich and Esses (who along with Defendant Avihai Shen were defendants in the Akerman Action) knew or should have known that the Form 10-K contained statements that were materially misleading; (3) a majority of the members of the Board at the time the Complaint was filed, Individual Defendants Ehrlich, Esses, Eastman, and Jones, signed a Form 10-K/A that was materially false and misleading when made, and was known or should have been known by them to be false, or was recklessly disregarded by them as such; (4) all of the members of the Board when the Complaint was filed, except for Individual Defendant Borey, stated after the motion to dismiss the securities fraud action was denied, but before the Complaint was filed, that the allegations in the Akerman Action - which are virtually identical to the allegations here - were *"without merit;"* and (5) a majority of those Board members stated recently that the instant derivative action also is "without merit."

These facts demonstrate a majority of the Board:  (1) was predisposed against the derivative action and, in fact, had already determined that virtually identical allegations in the earlier filed Akerman Action had no merit; and (2) faced a substantial likelihood of liability of liability based on the allegations of the Complaint, making demand futile.  As a result, the Defendants' motion to dismiss should be denied in full.

---

[3] The Board was comprised of seven members on May 6, 2009, the day Plaintiff filed the Complaint:  Robert S. Ehrlich; Steven Esses; Jay M. Eastman; Edward J. Borey; Seymour Jones; Elliot Sloyer; and Michael E. Marrus.  Ehrlich, Esses, Eastman, and Borey were directors during the entire "Relevant Period," which is defined as the period beginning on November 9, 2004, and ending on November 25, 2005.  Jones became a director in July 2005 and was on the Board for part of the Relevant Period.  Sloyer and Marrus became directors after the end of the Relevant Period.

## II.     FACTS[4]

Arotech is a Delaware corporation engaged in the development, manufacture, and marketing of defense and security products and services worldwide.  ¶ 5.[5]  The Company "operate[s] primarily as a holding company,  through [its] various  subsidiaries, which [it has] organized  into three  divisions."  Arotech Form 10-K for 2004, filed with the United States Securities and Exchange Commission ("SEC") on March 31, 2005 ("2004 10-K").  Ex. A.[6]  One of the three divisions is the Armor Division, which includes Arotech subsidiary Armour of America ("AoA").  *Id.*  Arotech acquired AoA in August 2004 for the sum of approximately $22 million.  The price exceeded Arotech's total revenues from continuing operations for the previous year.  ¶ 21.

 The Individual Defendants who were directors and/or officers at the time caused or allowed Arotech to acquire AoA seemingly without completing full due diligence because, also in August 2004, the U.S. government, a key customer of both AoA and Arotech,  terminated  a  contract  it  had  with  AoA  to  armor  approximately  20  CH-47 helicopters.  The government designated this action a termination for default ("T4D") because it concluded AoA had not told the truth about its product's specifications and performance.  The T4D in August 2004 significantly reduced AoA's ability to win future

---

[4] "When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court takes the facts as alleged in the complaint to be true, and must draw all reasonable inferences from those facts in favor of the plaintiff."  *Sylla v. City of New York,* 04-cv-5692 (ILG), 2005 U.S. Dist. LEXIS 31817, at *4 (E.D.N.Y. Dec. 8, 2005) (citation omitted).

[5] References to "¶ __" are to paragraphs of the Complaint.

[6] In reviewing a motion to dismiss under Fed. R. Civ. P 12(b), the Court may consider the complaint and "items in the public record."  *Papasan v. Allain,* 478 U.S. 265, 268 n.1 (1986).

contracts.  It is estimated that AoA lost millions of dollars solely in future helicopter armoring contracts as a result of the T4D.[7]  ¶ 22.

Internal control problems were present throughout AoA.  Poor internal inventory controls led to AoA manufacturing uncoordinated numbers of different parts of its products.  ¶ 26.  Arotech management, including Individual Defendants Ehrlich, the Company's Chairman Chief Executive Officer, and, at the time, President, Esses, and Shen, were aware of AoA's inventory control problems and received regular updates on materials, works in progress, and finished goods.  Senior management at Arotech even had access to AoA's accounting software, giving them the ability to run reports on AoA's inventory and sales. ¶ 27.

**The Individual Defendants' False and Misleading Statements**

On November 9, 2004, Arotech issued a press release announcing its results for its third quarter and the nine months ending on September 30, 2004.  Revenues for the third quarter were $16.3 million, an increase of 185% over the corresponding period in 2003, and 64% over the second quarter of 2004.  Revenue had grown to over $33 million for the first nine months of 2004, a 150% increase over the corresponding period for the prior year.  The very positive tone of the press release included a statement by Individual Defendant Ehrlich calling it "our best quarter ever."  Ehrlich went on to say:

---

[7] Individual Defendant Esses and other members of the senior management of Arotech were aware of the T4D and met with the Chief Operating Officer and General Manager of AoA, John Nehmens, regarding how to adjust operations due to the T4D and the difficulty it created in obtaining future contracts because of the need to explain the default.  ¶ 23.  As predicted, AoA's sales declined even though it continued to project large future revenues, because the U.S. government was a major customer of AoA.  The dearth of new contracts resulted in an excess inventory of materials such as Kevlar, which must be kept on hand in order to quickly fill orders, and must be used within approximately six months of purchase.  ¶ 24.

> *We have added several excellent companies to our portfolio, and these companies are contributing to our growth and expanding our customer base.*

¶ 28 (emphasis added).

On March 31, 2005, Arotech issued a press release announcing "record" results for its fourth quarter and the year-ending on December 31, 2004.  Revenues for the quarter were $16.6, an increase of 304% over the year-ago period, and 2% over the third quarter of 2004.  For the entire year, revenues increased to $50 million, which was 188% more than in 2003.  ¶ 30.

Individual Defendant Ehrlich again made positive statements about the Company's performance and prospective business opportunities in the Company's March 31, 2005 press release, including in relevant part:

> We finished the year with new record-high revenues and EBITDA profitability.  *The subsidiaries that we acquired in 2004 are now fully integrated into the Company and we have begun to benefit from the synergies of our entire portfolio of companies.*  Focused on three key product areas – simulation and security, armor, and battery and power systems – in which we have vast experience and expertise, *we are well-positioned to continue to increase our market share in the rapidly growing defense and security sector.*

¶ 31 (emphasis added).

On the same day, Individual Defendants Ehrlich, Esses, Eastman, and Borey, among others, signed the Company's 2004 10-K, which repeated the financial results reported in the press release and represented that the Company's consolidated financial statements had been prepared in accordance with generally accepted accounting principles ("GAAP").  Regarding "Goodwill," the Company noted that it stated "SFAS No. 142 requires goodwill to be tested for impairment on adoption of the Statement and at least annually thereafter or between annual tests in certain circumstances, and written

down when impaired, rather than being amortized as previous accounting standards required." ¶ 32.  It further represented that "[t]he Company performed the required annual impairment test of goodwill. Based on the management projections and using expected future discounted operating cash flows, no indication of goodwill impairment was identified." *Id*.  *The 2004 10-K did not contain one word about the acquisition of AoA in 2004, much less mention the T4D or its financial fallout on Arotech.*

On May 11, 2005, Arotech announced financial results for the first quarter ended March 31, 2005.  The Company reported a 45% revenue increase over the same period for the previous year.  ¶ 34.  The May 11, 2005 press release included guidance for the full year of 2005.  The Company reiterated its expectation of at least 25% revenue growth compared to 2004.  Adjusted EBITDA from existing operations was projected to triple for the year. Revenues for the second quarter of 2005 were predicted to increase by at least 30% compared to the same quarter of 2004, and adjusted EBITDA was expected to be breakeven or above for the quarter.  ¶ 35.

On May 16, 2005, the Company filed a Form 10-Q with the SEC for the first quarter of 2005, which was signed and certified by Individual Defendants Ehrlich and Shen.  The 10-Q repeated many of the statements in the May 11, 2005 press release.  The Company stated that its financial statements were in compliance with GAAP for interim financial information and that the financial statements reflected all adjustments necessary for a fair presentation of the Company's financial position as of March 31, 2005, and its operating results and cash flows for the three-month periods ended March 31, 2005, and 2004.  ¶ 36.

On August 15, 2005, Arotech issued a press release announcing its second quarter results for the period ending June 20, 2005. Announced revenues for the quarter increased 23.3% over the year-ago period. On a GAAP basis, gross profit was $3.6 million, or 30% of revenues, compared to $3.4 million, or 34% of revenues, for the corresponding period in 2004. The Company stated that the decline in the percentage of gross profit compared to revenue was due to "a lower margin mix of products in some of Arotech's subsidiaries." ¶ 37.

The Company's operating loss for the second quarter of 2005 was $4.5 million, an increase of $2.5 million over the second quarter of 2004. According to the August 15, 2005 press release, "[o]perating expenses for the quarter included a write down of $2.4 million for impairment of goodwill and other intangible assets in relation to Arotech's Armour of America subsidiary." ¶ 38.

Explaining these negative financial results, Individual Defendant Ehrlich was quoted as stating, in relevant part, that strong demand for certain products and services:

> was somewhat offset by the performance of our Armour of America, AoA, subsidiary which was below our expectations. As a result, we wrote down approximately $2.4 million in impairment charges. While we are disappointed with AoA's progress, we believe that there are significant opportunities to be achieved under the right focus. We therefore recently hired a President of our Armor Division, who will focus special attention on improving AoA.
>
> *We continue to maintain our outlook for substantial growth from existing operations for the full year of 2005 and remain confident that the second half of the year will be stronger in comparison to both the first half of 2005 and the corresponding period in 2004.*

¶ 39 (emphasis added).

On that same day, the Company also filed a Form 10-Q with the SEC, which was signed and certified by Individual Defendants Ehrlich and Shen. The 10-Q repeated

many of the statements in the August 15, 2005 press release.  The Company stated that its financial statements were in compliance with GAAP for interim financial information and that the financial statements reflected all adjustments necessary for a fair presentation of the Company's financial position as of June 30, 2005, and its operating results and cash flows for the three-month periods ended June 30, 2005, and 2004.  ¶ 40.

Also on August 15, 2005, the Company filed a Form 10-K/A ("2004 10-K/A") with the SEC because it determined it needed to restate certain previously issued financial statements.  Ex. B.  The 2004 10-K/A, which was signed by Individual Defendants Ehrlich, Esses, Eastman, and Jones, among others, acknowledged that "[a] *termination arising out of our default could expose us to liability and have a material adverse effect on our ability to re-compete for future contracts and orders* ... The termination of several of our significant contracts or nonrenewal of several of our significant contracts, could result in significant revenue shortfalls." (Emphasis added).

However, after admitting the general significance of a T4D, the 2004 10-K/A made no mention of AoA's T4D.  It stated that "[i]n December 2004, AoA filed an action against a U.S. government defense agency, seeking approximately $2.2 million in damages for alleged improper termination of a contract.  In its answer, the government agency counterclaimed, seeking approximately $2.1 million in reprocurement expenses.  AoA is preparing its answer to the counterclaim.  At this stage in the proceedings, the Company and its legal advisors cannot determine with any certainty whether AoA will have any liability and, if so, the extent of that liability."  While a government contracts expert would associate the term of art "reprocurement expenses" with a T4D, the typical investor would have no reason or ability to do so.  *See* 48 C.F.R. § 49.402-6.

- 9 -

On September 30, 2005, the Company issued a release entitled, "Arotech Secures $17.5 Million Convertible Debt Financing and Revamps Operations to Focus on Organic Growth and GAAP Profitability," which announced that Arotech sold at least $17.5 million in Company "Convertible Debt Financing."   The press release stated that the Company had privately sold "$17.5 million principal amount of senior secured notes, convertible to common stock at [$14.00] per share," which was a 26% premium of the stock trading price at the time, to certain institutional investors. The Company also stated that it would focus on achieving sustainable, profitable growth through its existing operations, while also vigorously cutting operating costs.  ¶ 41.

Although the press release maintained a generally positive tone regarding the Company's future financial prospects, Individual Defendant Ehrlich noted that AoA's performance was disappointing and hurting Company earnings, however, he stated his belief that the Convertible Debt Financing would "work to turn around this subsidiary."  ¶ 42.

**The True Financial and Operational Condition of Arotech is Belatedly Disclosed**

On November 14, 2005, less than two months after selling at least $17.5 million in convertible debt, the Company began to reveal its true financial condition.  On that date, the Company issued a release reporting that, on a GAAP basis, the Company's third quarter revenues had decreased more than $5 million compared to the prior year.  The decline was "largely attributable" to AoA's underperformance.  The Company's margins declined as gross profit shrank to 24.6% or revenues (including a $650,000 inventory write-off), compared to 29% of revenues for the same period in 2004.  The Company's results included a charge to operating income of $8.7 million for the impairment of

goodwill and other intangible assets reflecting a reevaluation of AoA's value resulting from its disappointing performance.  After including this charge, the Company sustained an operating loss of $12 million compared to breakeven for the same period in 2004.  ¶ 44.

Furthermore, according to the November 14, 2005 release, not only did the Company disclose that the "AoA acquisition has not contributed as expected," but also that Lee Ferguson, the President of AoA, had resigned, surprisingly only weeks after his appointment on August 15, 2005.  Such disclosures were even more unexpected because the Company previously stated that the integration of AoA was substantially complete.  ¶ 45.[8]

### The Securities Fraud Action

The above-described misconduct resulted in the initiation of the Akerman Action, alleging the Company and Individual Defendants Ehrlich, Esses, and Shen (collectively the "Securities Fraud Defendants") violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).  ¶¶ 49-50.

On March 30, 2009, this Court denied the Securities Fraud Defendants' motion to dismiss the securities fraud action pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds of materiality, scienter, and particularity.  *See Akerman, supra.*  The Court found that the plaintiffs in the Akerman Action had pled fraud with the requisite particularity under Fed. R. Civ. P. 9(b), and plead scienter with the requisite particularity under the PSLRA.

---

[8] Due to the large disparity between Individual Defendants' prior statements and those on November 14 and on November 15, 2005, Arotech stock dropped over $2.24 per share on the NASDAQ, closing at $6.16 per share, a decline of almost 27% compared to the previous day's closing at $8.40 per share.  ¶ 46.

The Company's Form 10-K for 2008 ("2008 10-K"), filed with the SEC on April 10, 2009, contained the following comments about the denial of the motion to dismiss in *Akerman*:

> The Complaint … alleges that we did not have adequate systems of internal operational or financial controls, and that our financial statements and reports were not prepared in accordance with GAAP and SEC rules. The Complaint seeks an unspecified amount of damage. … Our motion to dismiss the Complaint as a matter of law was denied in March 2009.

> Although the ultimate outcome of this matter cannot be determined with certainty, ***we believe that the allegations stated in the Complaint are without merit*** and we and our officers and directors named in the Complaint intend to defend ourselves vigorously against such allegations.

(Emphasis added).  The 2008 10-K was signed by Individual Defendants Ehrlich, Esses, Eastman, Jones, Sloyer and Marrus, *i.e.,* six of the seven members of the Board at the time Plaintiff filed his Complaint almost a month later on May 6, 2009.  Ex. C.

The Company's Form 10-Q for the period ending June 30, 2009, filed with the SEC on August 14, 2009 ("June 30, 2009 10-Q"), contained the following statement about the present action:

> We have learned that on May 6, 2009, a purported shareholders derivative complaint (the "Complaint") was apparently filed in the United States District Court for the Eastern District of New York against us and certain of our officers and directors. ***The Complaint is based on the same facts as the class action litigation currently pending against us in the same district ….***

> Although the ultimate outcome of this matter cannot be determined with certainty, ***we believe that the allegations stated in the Complaint are without merit*** and we and our officers and directors named in the Complaint intend to defend ourselves vigorously against such allegations[.]

Ex. D.  The 10-Q repeated the assertion that the securities fraud action also was "without merit."[9]

Plaintiff alleged the Individual Defendants knowingly or intentionally, or with reckless disregard for the truth, caused the Company to make false representations concerning Arotech's business, management capabilities, systems and controls, and strength and profitability during the Relevant Period because the Company was suffering from numerous undisclosed adverse factors that were negatively affecting its business and would foreseeably cause it to report declining financial results that were materially less than the market expectations that they had caused and cultivated, and failed to correct them.  ¶¶ 2, 74.  Furthermore, Plaintiff contended the Individual Defendants abused the trust reposed in them by virtue of their positions and breached their fiduciary duty of loyalty by abdicating their duty of oversight.  As the result of their sustained and systematic failure to exercise oversight, the Individual Defendants caused or allowed the Company's business to be conducted in violation of the extensive legal requirements and regulations known to them.  ¶ 75.  The Individual Defendants proximately caused significant injury to the Company, including a precipitous decline in the price of the Company's common stock, adverse publicity, the securities fraud action, fees to outside counsel, other litigation expenses, and other significant costs to the Company.  ¶¶ 72, 76.

---

[9] The same claim was made with respect to the derivative action <u>and</u> the securities fraud action in the Company's Form 10-Q for the period ending September 30, 2009, filed with the SEC on November 12, 2009 ("September 30, 2009 10-Q"), and in its Form 10-K for 2009 filed with the SEC on March 31, 2010 ("2009 10-K").  Exs. E, F.  In the 2009 10-K, the Company also reported that the Akerman Action was being settled for $2.9 million. Ex. F. The  2009 10-K was signed by Individual Defendants Ehrlich, Esses, Eastman, and Jones, a majority of the members of the Board at the time the present action was commenced.  *Id*.

# III.   ARGUMENT

**A.**   ***Demand Upon the Board is Futile***

A derivative complaint must "state with particularity:  (A) any effort by the plaintiff to obtain the desired action from the directors . . . ; and (B) the reasons for not obtaining the action or not making the effort."   Fed. R. Civ. P. 23.1(b)(3).   As demonstrated by the express language in the Company's 2008 Form 10-K almost a month before the Complaint was filed - that Defendants had determined that identical allegations were without merit - such a demand here would have been futile.  ¶ 61.

"The purpose of the demand requirement is not to insulate defendants from liability; rather, the demand requirement and the strict requirements of factual particularity under [Delaware Chancery Court] Rule 23.1 'exist to preserve the primacy of board decisionmaking regarding legal claims belonging to the corporation.'"   *In re Citigroup Inc. S'holder Deriv. Litig.,* 964 A.2d 106, 120 (Del. Ch. 2009) (quotation omitted).  The seminal cases of *Aronson v. Lewis,* 473 A.2d 805 (Del. 1984), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del. 2000), and *Rales v. Blasband,* 634 A.2d 927 (Del. 1993), articulate the legal standards for determining whether demand is excused.  *Guttman v. Huang,* 823 A.2d 492, 500-01 (Del. Ch. 2003).

Under *Aronson,* demand is excused if: (1) there is a reasonable doubt that the directors are "disinterested and independent;" or (2) the allegations create a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Brehm,* 746 A.2d at 256 (internal quotations omitted).  The test is in the disjunctive, meaning that if either part is satisfied, demand is excused.  *Id.*

*Rales* articulates three circumstances in which the *Aronson* standard will not be applied: "(1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation." *Rales,* 634 A.2d at 934.  In those situations, the court must determine "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations."  *Id.*  Under *Rales,* a court must therefore determine whether "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.  If the derivative plaintiff satisfies this burden, then demand will be excused as futile."[10]  *Id.*

Under both *Aronson* and *Rales,* the ultimate question is whether there is reasonable doubt that the directors are disinterested and independent.  Reasonable doubt "is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence."  *Grimes v. Donald,* 673 A.2d 1207, 1217 n.17 (Del. 1996), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del. 2000).  Reasonable doubt is a

---

[10] "Disinterested 'means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.'" *In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 808, 821 (Del. Ch. 2005) (quoting *Aronson,* 473 A.2d at 812).  A director is not disinterested if the allegations in the complaint raise a "substantial likelihood" of personal liability.  *Rales,* 634 A.2d at 936.  "'Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.'"  *J.P. Morgan Chase,* 906 A.2d at 821 (quoting *Aronson,* 473 A.2d at 816).

flexible and workable concept, and is found in various corporate contexts. *Grimes,* 673 A.2d at 1217. "Upon reviewing a motion to dismiss for failure to demonstrate demand futility pursuant to Rule 23.1, the Court must accept the well-pled factual allegations of the derivative complaint as true and draw all reasonable inferences in favor of plaintiffs."[11] *In re Dow Chem. Co. Deriv. Litig.,* Consol. C.A. No. 4349-CC, 2010 Del. Ch. LEXIS 2, at *21 (Del. Ch. Jan. 11, 2010) (citing *Rales,* 634 A.2d at 931).

To overcome the demand requirement, a plaintiff shareholder must "allege [] particularized facts creating a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a demand." *Rales,* 634 A.2d at 930. "Such reasonable doubt must be raised as to a majority of the board of directors sitting at the time the complaint is filed." *In re Morgan Stanley Deriv. Litig.,* 542 F. Supp. 2d 317, 322 (S.D.N.Y. 2008) (interpreting Delaware law).

There is no question that demand is futile with respect to Individual Defendants Ehrlich and Esses. As the Delaware Court of Chancery found recently, a director who is a defendant in a federal securities action that has "survived a motion to dismiss under the rigorous standards for pleading securities fraud" and who is also a defendant in a companion derivative action based on the same facts cannot "consider a demand impartially." *Pfeiffer v. Toll,* 989 A.2d 683, 690 (Del. Ch. 2010).

This principle makes perfect sense under the present circumstances. The Complaint alleged that Individual Defendant Esses was aware of the AoA T4D and met

---

[11] Plaintiff need not demonstrate a reasonable probability of success on the merits to establish demand futility. *Rales,* 634 A.2d at 934. If the Court finds that a reasonable doubt exists, then demand is excused. Futility does not mean that there is no possibility that the board will agree to the demand. *Heineman v. Datapoint Corp.,* 611 A.2d 950, 952 (Del. 1992), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del. 2000).

with its then-Chief Operating Officer and General Manager regarding how to adjust operations due to the T4D and the difficulty it created in obtaining future contracts because of the need to explain the default.  ¶ 23.  It stated that AoA's sales declined because of its T4D; it had excess inventory of certain perishable materials and trouble obtaining other supplies needed to compete for military contracts; and that it had numerous internal control problems.  ¶¶ 24-26.  The Complaint specifically alleged that Individual Defendants Ehrlich and Esses "were aware of AoA's inventory control problems and received regular updates on material, works in progress, and finished goods."  ¶ 27.  Moreover, AoA was using a format designed by Arotech for its monthly sales projection reports, which included information such as the probability of orders for AoA's products.  Senior management at Arotech even had access to AoA's accounting software, therefore giving them the ability to run reports on AoA's inventory and sales. *Id*.

These facts by themselves were sufficient for this Court to find in *Akerman* that Individual Defendants Ehrlich and Esses "should have known" or "must have known" at the time they released non-adverse, and affirmatively optimistic information about AoA, that the Company was saddled with a T4D that would damage its capacity to compete for new business.  608 F. Supp. 2d at 387.  This eliminated any possibility they could consider a demand with disinterest.

Moreover, the Complaint stated that "[a]s a result of the materially false and misleading statements and the failure to disclose information, including the underperformance of AoA, over a period of approximately twelve months, the Individual Defendants created an unrealistic positive assessment of Arotech and its business,

prospects and operations, causing the Company's common stock to be overvalued and artificially inflated at all relevant times.   However, when investors learned of the Individual Defendants' misrepresentations and fraudulent conduct, shares of Arotech immediately sharply declined." ¶ 47.   Furthermore, "[a]t no time during the Relevant Period did the Defendants identify the true cause for AoA's poor performance, *viz.,* the T4D and its affect on AoA's ability to obtain new business with the U.S. government." ¶ 48.   These allegations were substantially similar to those made by the plaintiffs in the securities fraud action.   ¶ 50.   Because the securities fraud action naming Individual Defendants Ehrlich and Esses as defendants had survived a motion to dismiss before the Complaint was filed, there is no possibility they could have considered impartially a demand by the Plaintiff.

**1.      A Majority of the Board Predetermined the Derivative Complaint
          Was Without Merit, Making Demand Futile**

The Defendants' claim that "none" of the Individual Defendants faced a substantial likelihood of liability "for any supposed breach of their duties of care or loyalty" is preposterous given that this Court had denied the defendants' motion to dismiss in the securities fraud action less than a month before the Complaint was filed and Individual Defendants Ehrlich and Esses were named defendants in the securities fraud action.   As a result, with two Individual Defendants lacking impartiality under any circumstances, Plaintiff must only demonstrate that another two of the remaining five Individual Defendants who were on the Board at the time the Complaint was filed (*i.e.,* Borey, Eastman, Jones, Marrus, or Sloyer) lacked disinterestedness or independence in order to establish demand futility.

Individual Defendants Eastman, Jones, Marrus, and Sloyer (as well as Ehrlich and Esses), six of the those directors, signed the 2008 10-K after the motion to dismiss in *Akerman* was denied.  The 2008 10-K that stated "***we believe that the allegations stated in the [securities fraud] Complaint are without merit*** and we and our officers and directors named in the Complaint intend to defend ourselves vigorously against such allegations."  If they believed the securities fraud action was meritless, even after the defendants' motion to dismiss was denied, then there is no reasonable possibility they would have considered the later filed Complaint to have merit.  This was borne out in the June 30, 2009 10-Q, the September 30, 2009 10-Q, and the 2009 10-K, which stated "we believe that the allegations stated in [both] the Class Action Complaint and the Derivative Complaint are without merit and we and our officers and directors named in the Complaint intend to defend ourselves vigorously against such allegations."  The 2009 10-K was signed by Individual Defendants Eastman and Jones (along with Ehrlich and Esses), four of the seven directors, a majority of the Board.

"The federal courts should not interfere in the matters of private corporations, nor should they sanction the interference by shareholders with the duties of the board of directors unless it is clear that the board has no intention of taking the appropriate action itself."  *Brooks v. American Exp. Indus., Inc.,* 68 F.R.D. 506, 510 (S.D.N.Y. 1975).  In this vein, it is possible for the Court to find a board conceded the futility of demand if a derivative plaintiff alleges particularized facts to this effect.  *Seminaris v. Landa,* 662 A.2d 1350, 1353 (Del. Ch. 1995).  A "determination of the Board of Directors…that [the action] maintained by Plaintiff . . . is inconsistent with the best interest of the corporation provided a loud and clear message that under no circumstances would the Board of

Directors approve the corporation bringing the action." *Jerozal v. Cash Reserve Mgmt., Inc.,* No. 81 Civ. 1569, 1982 U.S. Dist. LEXIS 16566, at *11 (S.D.N.Y. Aug. 10, 1982) (quotations omitted).   "[S]ignificant substantive opposition to plaintiff's claims may manifest the futility of any demand." *Id.,* at *12.   *See also Blatt v. Dean Witter Reynolds Intercapital Inc.,* 528 F. Supp. 1152, 1155 (S.D.N.Y. 1982) (demand excused where independent directors, a majority of the board, had previously made a determination rejecting the derivative plaintiff's contention).

Here, a majority of the Individual Defendants who were members of the Board at the time Plaintiff filed his Complaint stated unequivocally on several occasions that the Complaint is meritless.[12]   Requiring the Plaintiff to make demand on the Board would be a meaningless exercise in futility, an empty gesture, because the Board has made its position known.   Put another way, having told Plaintiff the Complaint is meritless, it is unrealistic to expect the Board to treat a demand for action in an impartial and disinterested manner.   Plaintiff has carried his burden of pleading particularized facts that establish demand futility.

> **2.** <u>**A Majority of the Board Faced A Substantial Likelihood of Liability if a Derivative Action Was Initiated, Making Demand Futile**</u>

Individual Defendants Eastman and Borey (along with Ehrlich and Esses) signed the 2004 10-K.   As alleged in the Complaint, the financial results in the 2004 10-K and the statements therein regarding Goodwill and GAAP compliance were each materially false and misleading when made, and were known by Individual Defendants Eastman,

---

[12] In the Stipulation and Agreement of Settlement filed with this Court in the Akerman Action, dated January 7, 2010, Defendants continue to deny any wrongdoing or liability.

Borey, Ehrlich, and Esses to be false or were recklessly disregarded as such by them because, among other things:

    (a)    At all times during the Relevant Period, the Company's purported success was not the result of its integration of acquisitions or the Individual Defendants' competent management.  In fact, throughout the Relevant Period, the acquisition of AoA was not proceeding according to plan as AoA's sales were faltering badly, and, to mask this fact, the Individual Defendants had propped up the Company's results by manipulating Arotech's accounting by failing to report the impaired condition of its assets or to properly reserve for the necessary and proper impairment expenses;

    (b)    At all times during the Relevant Period, the Individual Defendants had materially overstated the Company's profitability by under-reporting Arotech's diminished asset values and rising impairment costs by failing to make proper, timely adjustments to the Company's stated reports;

    (c)    Throughout the Relevant Period, Arotech did not have adequate systems of internal operational or financial controls, and as a result Arotech's reported financial statements were not true, accurate, or reliable;

    (d)    As a result of the foregoing, throughout the Relevant Period the Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules; and

    (e)    As a result of the aforementioned adverse conditions which the Individual Defendants failed to disclose, throughout the Relevant Period, the Individual Defendants lacked any reasonable basis to claim that Arotech was operating according to plan or that Arotech could achieve guidance sponsored and/or endorsed by the Individual Defendants.

¶ 33.

Not only that, but the 2004 10-K made no mention of Arotech's acqustion of AoA, much less AoA's T4D or the problems it was causing the Company.  Moreover, as noted by the Court in *Akerman,* "Arotech was litigating the government's termination of the AofA contract [which] undermines the argument that management did not know that

the termination was for default."  608 F. Supp. 2d at 387.[13]

Furthermore, the 2004 10-K/A, while acknowledging the significance of a T4D and that AoA was in litigation with the government, failed to mention that the litigation concerned the T4D of a major AoA contract.  The 2004 10-K/A was signed by Individual Defendants Ehrlich, Esses, Eastman, and Jones.

Individual Defendants Eastman, Borey, and Jones, in addition to Ehrlich and Esses, unquestionably knew, should have known, or recklessly disregarded that the acquisition of AoA, *whose price exceeded Arotech's total revenues from continuing operations for the previous year,* had come with a T4D of a major contract; that AoA faced declining sales, the loss of millions of dollars of future contracting opportunities, and excess inventory of perishable materials and an impaired ability to obtain supplies; that AoA had a dysfunctional inventory control system; and that AoA had initiated litigation against the government regarding the T4D.[14]  Nevertheless, they signed the 2004 10-K and/or the 2004 10-K/A that gave nary a hint of any of these major problems, nor did they (or Individual Defendant Jones, after he joined the Board) object to any of the other materially false and misleading statements issued by the Company during the Relevant Period, all in violation of their fiduciary duties of loyalty.

Thus, Individual Defendants Eastman, Borey, and Jones, in addition to Individual

---

[13] In fact, AoA had initiated litigation in December 2004 against the government regarding the T4D in the United States Court of Federal Claims.  *Armour of America v. United States,* 69 Fed. Cl. 587 (2006).

[14] Alternatively, these Individual Defendants utterly disregarded their fiduciary duty to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of Arotech from violating or acting in contravention to applicable laws, rules and regulations.

Defendants Ehrlich and Esses, faced a substantial likelihood of liability if a derivative action was initiated against them.  This certainly created a reasonable doubt as to their disinterestedness, in that a demand by the Plaintiff would be a request to sue themselves. In that Individual Defendants Eastman, Borey, Jones, Ehrlich, and Esses constituted a majority of Arotech's Board at the time Plaintiff filed his Complaint, demand is excused as futile on this basis as well.

**B.**    *The Defendants' Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) Should Be Denied*

The Defendants make the facially flawed argument that the Complaint should be dismissed under Rule 12(b)(6) because "Plaintiff has failed to state a claim that *any* Arotech director has breached his fiduciary duty of loyalty."  Def. Mem., 16 (emphasis added).

The standard for considering a motions to dismiss under Rule 12(b)(6) is as follows:

> Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles. *Harris v. Mills,* 572 F.3d 66 (2d Cir. 2009) (citing *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).

> "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* (quoting *Iqbal,* 129 S. Ct. at 1949). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal,* 129 S. Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court

should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." *Iqbal,* 129 S. Ct. at 1950.

*Robischung-Walsh v. Nassau County Police Dep't,* No. 09-CV-3567 (ADS) (ETB), 2010 U.S. Dist. LEXIS 30679, at *3-*4 (E.D.N.Y. Mar. 30, 2010).

"The standard for pleading demand futility under Rule 23.1 is more stringent than the standard under Rule 12(b)(6), and a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim." *In re Dow Chem. Co.*, 2010 Del. Ch. LEXIS 2, at *3 (emphasis added; quotations omitted). As such, the same facts that support a determination of demand futility, particularly those demonstrating the lack of impartiality of Individual Defendants Ehrlich and Esses and showing a substantial likelihood of a liability on the part of Individual Defendants Eastman and Borey, also are sufficient for the Court to find it plausible that the Individual Defendants breached their fiduciary duties of loyalty to the Company by causing and cultivating, and failing to correct the Company's public announcements, and causing or allowing the Company's business to be conducted in violation of the extensive legal requirements and regulations known to them, as alleged in the Complaint. ¶¶ 74-75.[15] Specifically, they signed or approved one or more documents released to investors that were materially false and misleading when made, and which they knew or should have known to be false and misleading, or were recklessly disregarded by them as such, in breach of their fiduciary duties of loyalty. *See, e.g., Albert v. Alex. Brown Mgmt. Servs.,* C.A. No. 762-N, C.A.

---

[15] The Defendants' exculpation argument falls flat because Plaintiff has alleged particularized facts demonstrating that a majority of the Board breached their fiduciary duties of loyalty. Def. Mem., 10.

No. 763-N, 2005 Del. Ch. LEXIS 133 at 20 (Del Ch. Aug. 26, 2005) (sustaining breach of duty of due care claim based on failure to disclose material information).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.

Dated: May 3, 2010                     **RIGRODSKY & LONG, P.A.**


By: */s/ Timothy J. MacFall*
    Seth D. Rigrodsky (SR-9430)
    Timothy J. MacFall (TM-8639)
    585 Stewart Avenue, Suite 304
    Garden City, NY  11530
    Tel:  (516) 683-3516
    Fax:  (302) 654-7530

    **GLANCY BINKOW & GOLDBERG LLP**
    Lionel Z. Glancy
    Michael Goldberg
    1801 Avenue of the Stars, Suite 311
    Los Angeles, CA  90067
    Tel.:  (310) 201-9150
    Fax:  (310) 201-9160

    *Counsel for Plaintiff*